Joseph FEWLESS, by his parents,
Patrick and Sherri FEWLESS,
Plaintiffs,

v.

BOARD OF EDUCATION OF WAY-
LAND UNION SCHOOLS, Thomas
Cutler, Larry Medendorp, Jack Dem-
ing, and Thomas J. Tarnutzer, Defen-
dants.

No. 1:01–CV–271.

United States District Court,
W.D. Michigan,
Southern Division.

July 11, 2002.

Myra Dutton Johnson, Muskegon, MI, for Plaintiffs.

Thomas R. Wurst, Kristen L. Kroger, Grand Rapids, MI, for Defendants.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on Plaintiffs' and Defendants' cross motions for summary judgment. The Court will grant Plaintiffs' Motion for Summary Judgment as to the claim made against Defendants Thomas Cutler and Larry Medendorp in their personal capacities.[1] The Court will grant Defendants' Motion for Summary Judgment as to the claim made against all Defendants in their official capacities. The issue of Plaintiffs' damages remains for trial.

## I. Standard of Review

Review of a motion for summary judgment requires the Court to determine if there exists no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under the language of this rule, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.

---

1. Plaintiffs' motion was styled as "Plaintiffs' Motion for Summary Disposition." The Court notes that "summary disposition" is the name of the procedure by which summary judgment is sought in Michigan state court, but "summary judgment" is the proper term in federal court.

R.Civ.P. 56(c). Moreover, affidavits must meet certain requirements:

> [A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed.R.Civ.P. 56(e). The Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir.1993) (citations omitted). Thus, in resolving a motion for summary judgment, the Court should not consider unsworn or uncertified documents, *id.;* unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–969 (6th Cir.1991); inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir.1997); or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996); *Wiley v. United States*, 20 F.3d 222, 225–226 (6th Cir.1994).

## II. Facts

Plaintiffs Patrick and Sherri Fewless, on behalf of their minor son Joseph Fewless,[2] filed this action against Defendants Board of Education of Wayland Union Schools, Thomas Cutler, Larry Medendorp, Jack Deming, and Thomas Tarnutzer (collectively "Defendants"), alleging unlawful deprivation of Joseph's constitutional rights under 42 U.S.C. § 1983. Plaintiffs claim that Joseph Fewless' Fourth and Fourteenth Amendment rights were violated when Defendants Thomas Cutler and Larry Medendorp performed an allegedly illegal strip search of Joseph's person at school.

Defendant Thomas Cutler is the Assistant Principal at Wayland Union High School. (Cutler Dep. at 4.) Defendant Larry Medendorp, previously a state police officer, is a security person and events coordinator for Wayland Union Schools. (Medendorp Dep. at 4, 10.) Defendants Cutler and Medendorp both testified that neither of them had performed any other strip searches while employed at Wayland Union High School. (Cutler Dep. at 51–53, Medendorp Dep. at 17.)

Defendants Jack Deming, Principal of Wayland Union High School, and Thomas Tarnutzer, Superintendent of Wayland Union Schools, were not informed of any search of Joseph Fewless until after the searches occurred. (Cutler Dep. at 5, 62–63; Tarnutzer Aff. at ¶ 3; Deming Aff. at ¶ 2.) No other strip searches had yet been performed in the 2000–2001 school year. (Plaintiffs' Motion for Summary Disposition, Ex. F.[3])

---

**2.** The wrong alleged was committed against only Joseph Fewless. However, cases discussing suits such as this one brought in the name of an infant plaintiff under Federal Rule of Civil Procedure 17(c) discuss the injured party and the next friend or friends collectively as "Plaintiffs." *See, e.g., Helminski v. Ayerst Laboratories*, 766 F.2d 208, 210 (6th Cir. 1985) (referring to the parents who brought the lawsuit on behalf of the child as "plaintiffs"). Therefore, this Court will refer to "Plaintiffs" meaning Joseph Fewless and his next friends, Patrick and Sherri Fewless.

**3.** Plaintiffs' Exhibit F is a document which was apparently prepared by Defendant Cutler because the words "[p]repared by Thomas Cutler" appear at the top of the page. This document apparently lists all of the searches of students performed during the 2000–2001 school year by Defendant Cutler; the grade of the student; what was searched; and what contraband, if any, was found. Considering this document as part of the record evidence would normally present evidentiary problems, but since Defendants have not objected to its consideration, the Court will accept the statement gleaned from it as true for these purposes.

On April 20, 2001 at Wayland Union High School, two searches of Joseph Fewless occurred on suspicion that he was in possession of marijuana. (Fewless Dep. at 51;[4] Cutler Dep. at 5.) Joseph Fewless was fourteen years old at the time of the searches. (Plaintiffs' Motion for Summary Disposition, Ex. A, at 7.)

Prior to the first search, four students, Chet Kemp, Darin Stark, Ryan Terpstra, and Kirk Blaauw, reported to Defendant Cutler that Joseph Fewless had marijuana at school. (Cutler Dep. at 36; Terpstra Aff. at ¶ 2.) The students were allegedly questioned together in Mr. Cutler's office regarding this accusation. (Cutler Dep. at 5.) Defendant Cutler testified these students said that Joseph Fewless told them he possessed marijuana in a dime roll[5] during Curd Alexander's class. (Cutler Dep. at 5.) Mr. Alexander is the teacher of a small gas engine and home improvement class. (Fewless Dep. at 43.) Several of the informants said they saw the dime roll and one student claimed to have seen the actual marijuana. (Cutler Dep. at 5–6; Lettinga Aff. at ¶ 2; Terpstra Aff. at ¶ 3.)

Joseph Fewless admits he removed a dime roll from his pocket and showed it to his classmates during Mr. Alexander's class. (Fewless Dep. at 56.) However, contrary to the students' accounts, Joseph claims he did not tell classmates he had marijuana, nor did he smell the dime roll or act like he was smoking it. (Fewless Dep. at 56–57.)

The day after the searches of Joseph Fewless, on April 21, 2001, Chet Kemp, Darrin Stark, Ryan Terpstra, and Justin Lettinga were all scheduled to serve a Saturday detention as punishment for an incident involving the destruction of Joseph's lawn mower in Mr. Alexander's small gas engine repair class, and they did serve that detention. (Cutler Dep. at 30.) All but one of the boys had been ordered to help pay for the cost to repair the mower as well. (Cutler Dep. at 31.) Defendant Cutler was aware of this, as well as Joseph's problems involving students picking on him in the past. (Cutler Dep. at 28, 31–32, 45.) Defendant Cutler was also aware that Joseph Fewless was a special education student. (Cutler Dep. at 27.)

Defendant Cutler stated that when the group of students made their report to him, Chet Kemp seemed "upset and stated that he did not want to be around drugs." (Cutler Aff. at ¶ 2.) Defendant Cutler asserts that a family member of Chet Kemp's reportedly has been involved with drugs in the past, and Chet's emotional state led Defendant Cutler to believe that Chet was telling the truth. (*Id.*)

After receiving the reports from the four students and the teacher, Defendant Cutler stopped Joseph Fewless and asked him to come with him to his office. Defendant Cutler claims Joseph Fewless voluntarily handed over a pink cigarette lighter, which is considered contraband, when the two were on their way to Defendant Cutler's office. (Cutler Dep. at 7, 21.) However, Joseph Fewless does not recall turning in a cigarette lighter on the day of the search. (Fewless Dep. at 24.) Once in Defendant Cutler's office, Defendant Cutler told Joseph about the accusation that Joseph was in possession of marijuana at school. (Cutler Dep. at 8.) Joseph denied having any marijuana. (*Id.*)

Defendant Cutler then searched Joseph Fewless' gym bag, pockets, and dime roll, and Joseph was cooperative in this search. (Cutler Dep. at 8.) The search turned up

---

**4.** "Fewless Dep." refers to the deposition of Joseph Fewless.

**5.** The Court assumes that the "dime roll" was a paper container for storage of coin currency of the kind typically used by banks. ·

no marijuana, and Joseph was sent back to class. The legality of this search is not at issue. After Defendant Cutler's search of Joseph's gym bag, dime roll and pockets, Defendant Cutler reported to Justin Lettinga, another student, and Ryan Terpstra that no marijuana was found on Joseph Fewless. (Terpstra Aff. at ¶ 2.)

After the first search and later that day, students Ryan Terpstra and Justin Lettinga reported to Defendant Cutler that Joseph Fewless said he evaded the first search because he hid the marijuana in his "butt crack." (Cutler Dep. at 12; Lettinga Aff. at ¶ 3; Terpstra Aff. at ¶ 4.) At about the same time, Mr. Alexander reported to Mr. Cutler that he was told by students that Joseph had drugs down "the crack of his ass." (Cutler Dep. at 10–11.) Mr. Alexander did not report that he actually saw marijuana, personally heard Joseph say this, saw Joseph acting suspiciously or smelled marijuana on Joseph. (*Cf.* Cutler Dep. at 11.)

Defendant Cutler then shared the additional information he received about Joseph Fewless with Defendant Medendorp. (Cutler Dep. at 12.) Defendant Cutler found Joseph in the cafeteria after concluding Joseph was attempting to evade him. (Cutler Dep. at 13, 26.) Defendant Cutler asserts that he came to this conclusion because he and Joseph made eye contact across the cafeteria, and then Joseph turned his head and left the cafeteria. (Cutler Dep. at 13.) Defendant Cutler did not make any motion to stop Joseph or call out to him because he felt there was not time since Joseph was leaving the cafeteria and because, with all of the other students present, Joseph would not have heard him

call out. (*Id.*) When Defendant Cutler caught up to Joseph in the hallway and asked Joseph to come to his office, he did not smell marijuana on Joseph during their walk to the office. (Cutler Dep. at 23.)

Joseph Fewless claims he did not say to anyone that he hid marijuana in his "butt crack." (Fewless Dep. at 55–57.) He testified that Defendant Cutler told him Paul Kiry was the informant who made this assertion, rather than Ryan Terpstra, Justin Lettinga, and Mr. Alexander. (Fewless Dep. at 63.)

Joseph Fewless asserts that he believes that Paul Kiry made this accusation to Defendant Cutler because Paul Kiry told him that he did, and because the two classmates had trouble getting along in the past. (Fewless Dep. at 58.) Joseph Fewless stated that Paul Kiry assaulted him on numerous occasions. (Fewless Dep. at 49–51, 105.) Earlier in the year, Joseph and his mother Sherri Fewless reported to Defendant Cutler that Paul Kiry possessed drugs at school. (Cutler Dep. at 49–50; Fewless Dep. at 45–46.) The subsequent search of Paul Kiry produced marijuana. (Cutler Dep. at 50.[6]) Paul Kiry also knew about the subsequent strip search of Joseph after it happened and harassed and teased Joseph about it. (Cutler Dep. at 44.)

Defendants allege that the following scenario took place next: Defendant Cutler brought Joseph into his office [7] and told Joseph that Defendant Cutler was told by students that Joseph hid marijuana in his "butt crack." (Cutler Dep. at 15.) Joseph said, "No, I don't have any. I don't have anything to hide." (*Id.*)

---

**6.** Defendant Cutler's information that the search of Paul Kiry produced marijuana is hearsay, in that he testified that he was told the search produced marijuana and did not conduct the search himself. However, this information was not disputed by Defendants.

**7.** Defendant Cutler's office measures about eight feet by eight feet. (Medendorp Dep. at 9.)

Defendant Medendorp then entered the office, and Defendant Cutler said to him that Joseph agreed to "drop his drawers." (Cutler Dep. at 15.) Defendant Medendorp then told Joseph that he did not have to consent to the search. (Cutler Dep. at 17.) Defendant Cutler asserts that Joseph then began to stand up, and Defendant Medendorp stated again: "Joe, this has to be freely and voluntary on your part." (Id.) Joseph then reportedly said that he understood and that he did not have anything to hide. (Id.) Defendant Medendorp then reportedly said, "I want you to understand this has to be freely and voluntary on your part. You don't have to do this. If you want to, we'll walk out the door." (Id.) Again, Joseph reportedly said that he did not have anything to hide. (Id.) Defendants Medendorp and Cutler testified that Joseph appeared "relaxed," "comfortable," and "anxious to show" that he was not in possession of marijuana. (Cutler Dep. at 17; Medendorp Dep. at 8.)

Thus, Defendants allege that Defendant Medendorp informed Joseph Fewless three times that Joseph did not have to consent to the search and it had to be voluntary. (Cutler Dep. at 17, 23; Medendorp Dep. at 9.) Defendants Cutler and Medendorp assert that they believed Joseph understood this and that he subsequently consented to the search. (Cutler Dep. at 17; Medendorp Dep. at 8–9.) Patrick Fewless, Joseph's stepfather, testified that Joseph told him after the search that he was asked to consent to the search, and Patrick Fewless testified that he believed Joseph said Defendant Cutler did the asking. (P. Fewless Dep. at 44.) Defendant Cutler, however, testified that he personally did not ask Joseph if he would permit a search, nor did he explain Joseph's constitutional rights to him. (Cutler Dep. at 15, 23.)

Joseph Fewless claims that Defendants Cutler and Medendorp said they were going to perform a strip search if that was okay with him. (Fewless Dep. at 66.) Joseph asserts that he then told Defendants Cutler and Medendorp that he had nothing to hide and that Defendants Cutler and Medendorp responded by saying that they could do the strip search "or the four police officers standing outside can do it." (Id.) Defendant Medendorp denied this specific allegation. (Medendorp Dep. at 14.) Joseph asserts that he was then told to go and stand by the wall and pull down his pants, which he did but that he was scared. (Fewless Dep. at 66.) Joseph denies being told the search "had to be voluntary." (Fewless Dep. at 70.)

The scope of the search is also in dispute. Defendant Cutler claims Joseph Fewless lowered his pants to about four to five inches above the knee, and Defendant Medendorp pulled the waistband of Joseph's boxer shorts back. (Cutler Dep. at 18.) Defendant Medendorp confirmed Defendant Cutler's account and stated he let go of Joseph's boxers after looking down the back of the boxers at Joseph's buttocks. (Cutler Dep. at 18; Medendorp Dep. at 9.)

However, Joseph Fewless claims he dropped his boxers as well as his pants to his ankles. (Fewless Dep. at 68–69.) Joseph also asserts that Defendant Medendorp pulled up Joseph's shirt and looked at his "front side" after Joseph dropped his pants and boxers to his ankles. (Fewless Dep. at 69.) No marijuana was found on Joseph's person as the result of the second search. (Medendorp Dep. at 9–10.[8])

---

8. The Court cannot consider as evidence a memo submitted by Plaintiffs which was purportedly written by Mr. Jamey Vermaat, a special education teacher for Wayland Public Schools. The memo does not comport with the requirements of Federal Rule of Civil Procedure 56(e), and thus was not considered by the Court.

Defendant Medendorp acted on the basis of Defendant Cutler's information and directive. (Medendorp Dep. at 10, 21.) Defendant Medendorp was not told which students gave Defendant Cutler the tip that he received. (Medendorp Dep. at 5.) Finally, Defendant Cutler called Joseph's mother, Sherri Fewless, after the search, but not prior to it. (Cutler Dep. at 18, 26.)

Joseph Fewless has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), and is eligible for special education services under the educational definition of being a Physically or Otherwise Health Impaired ("POHI") student.[9] (Plaintiffs' Motion for Summary Disposition, Ex. A, at 7.) Joseph has a history of lying, which he is working on with his doctors. (Fewless Dep. at 9; Med. Rec. at 103, 106, 113, 115, 118, 120, 127, 137, 382). Joseph's attention deficit disorder typically involves impulsive behavior and a lack of appropriate social judgment. (See Wayland Schools Special Programs Center, Assessment of Joseph Fewless and Explanation of ADHD, at Plaintiffs' Ex. A.) Joseph has a long history of disciplinary problems at Wayland Union High School, typically involving disruptive behavior like leaving his seat in class or talking out of turn. (Cutler Dep. at 27, 64, 65.) However, Joseph Fewless has never been disciplined at school for an offense involving drugs. (Cutler Dep. at 65.) In fact, prior to the second search, Defendant Cutler knew Joseph Fewless had never been accused of possession, use, or intoxication at school in the past. (Cutler Dep. at 8, 17, 27.) While Defendants have alleged instances where Joseph tested positive for marijuana or was accused of possessing marijuana in settings outside of school, there is no indication that Defendant Cutler knew about these alleged incidents or that the alleged incidents occurred prior to the search at issue in this lawsuit.

### III. Analysis of Plaintiffs' Motion for Summary Judgment

To win summary judgment on their Fourth Amendment claim against Defendants Cutler and Medendorp, who were sued in their personal capacities, Plaintiffs must show that no reasonable jury could find other than that Joseph's Fourth Amendment rights were violated by Defendants Cutler and Medendorp. Plaintiffs must also demonstrate that qualified immunity does not entitle Defendants Cutler and Medendorp to summary judgment as to this claim. To win summary judgment as to the Defendants sued in their official capacities, Plaintiffs must show that Joseph's Fourth Amendment rights were violated and that school policy was the moving force behind the violation.

School officials are subject to constitutional restraints as state actors. *Tarter v. Raybuck*, 742 F.2d 977, 981 (6th Cir.1984). Therefore, Defendants Cutler and Medendorp have two avenues, given the circumstances and their allegations, through which they could prove that Joseph Fewless' Fourth Amendment rights were not violated: (1) Joseph gave legally valid consent to the search, or (2) the search was "reasonable." Even examining the facts in a light most favorable to Defendants, De-

---

9. Plaintiffs' briefing argues that Joseph has been "diagnosed ... with post traumatic stress disorder and [is] suspect[ed to have] mild dissociative episodes which prevent Joseph from recalling some events." (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Disposition at 2 (citing Med. Rec. at 205).) However, the medical record cited by Plaintiffs contains a note apparently written by a doctor to another professional expressing suspicion of post traumatic stress disorder ("PTSD"), not a diagnosis. Moreover, the doctor apparently writing the note does not draw any conclusions about these conditions, and does not draw the conclusion that these conditions would or might prevent Joseph from recalling some events.

fendants Cutler and Medendorp cannot show either. Moreover, the Court does not find that qualified immunity shields them from liability. Therefore, this Court finds that Plaintiffs are entitled to summary judgment as to their claim against Defendants Cutler and Medendorp, as sued in their personal capacities, but not as to the claim against any of the Defendants sued in their official capacities.[10]

## A. Whether Joseph Fewless Consented To The Strip Search

■ A search authorized by consent of the searched individual is constitutionally permissible, as long as the consent was given both freely and voluntarily. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Defendants assert that Joseph Fewless gave constitutionally valid consent to be strip searched.

Voluntariness of a consent to a search should be determined from the totality of the circumstances, including both the characteristics of the searched party and the details of the interrogation. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. First, the Court should examine the characteristics of the searched individual, including age, intelligence, and education; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. *United States v. Jones*, 846 F.2d 358, 360 (6th Cir.1988). Second, the Court should consider the details of any detention, including length and nature of detention, and the use of coercive or punishing conduct. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041. Further, the Court is to consider indications of more subtle forms of coercion that might impact an individual's judgment. *See United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

The Sixth Circuit has held that there is a presumption against the waiver of constitutional rights. *Tarter*, 742 F.2d at 980. When litigating the issue of consent, the burden is on the defendants to demonstrate such a voluntary relinquishment of constitutional rights by the plaintiff. *Id.* at 980. Consent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion. *United States v. Williams*, 754 F.2d 672, 674–75 (6th Cir.1985). Consent must not be coerced, by explicit or implicit means, by implied threat, or covert force. *Schneckloth*, 412 U.S. at 228, 93 S.Ct. 2041. When conducting this analysis, account must also be taken for the potentially vulnerable subjective state of the searched person. *Id.* at 229, 93 S.Ct. 2041.[11]

---

**10.** Plaintiffs' Complaint contains one Count which alleges a violation of 42 U.S.C. § 1983. Within the description of this Count, Plaintiffs discuss the constitutional right to be free of unreasonable personal searches. Plaintiffs seem to implicate the Fourteenth Amendment as well by stating that "[t]he Fourth and Fourteenth Amendments to the United States Constitution prohibit unreasonable searches." (*See* Complaint, at ¶ 24.) However, the Fourteenth Amendment does not directly prohibit unreasonable searches except as the Due Process Clause of the Fourteenth Amendment makes the Fourth Amendment's requirements applicable to the states. *See Mapp v. Ohio*, 367 U.S. 643, 650, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The Court will assume that this was the meaning intended by Plaintiffs' reference to the Fourteenth Amendment in the Complaint.

**11.** Defendants cite *United States v. Crowder* for the proposition that the plaintiff must show more than a subjective belief of coercion, but also some objectively improper action on the part of the defendants. *Crowder*, 62 F.3d 782, 787 (6th Cir.1995). For this proposition, the *Crowder* Court apparently refers to *Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598, but does not cite to a particular page number. *See id.* In addition, this Court can find no location in *Watson* where such a proposition may be derived. Finally, this proposition of law would seem to be in direct

When consent is relied upon as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search. *United States v. Gant,* 112 F.3d 239, 242 (6th Cir.1997) (citing *Florida v. Jimeno,* 500 U.S. 248, 251–52, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). The standard for measuring the scope of consent is an objective reasonableness standard, asking what the reasonable person would have understood by the exchange between the official and suspect. *Gant,* 112 F.3d at 242 (citing *Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801).

Because this is Plaintiffs' Motion for Summary Judgment, the Court must consider the record in a light most favorable to Defendants. Therefore, the Court will assume that Defendant Cutler asked Joseph Fewless about the accusation, he denied it, and he said that he did not have anything to hide. Defendant Cutler did not ask Joseph if he would permit a strip search. Defendant Medendorp then entered Defendant Cutler's office and was told by Defendant Cutler that Joseph agreed to "drop his. drawers." Defendant Medendorp then told Joseph three times that the search had to be performed with Joseph's consent, and that the parties would "walk out the door" if Joseph did not consent. Joseph's response was again that he did not have anything to hide.

Considering the facts in a light most favorable to Defendants, Joseph was a fourteen-year-old youth at the time of this exchange, considered a special education student, and had ADHD. This information was known to Defendants Cutler and Medendorp. Joseph was escorted to a school official's office, measuring eight feet by eight feet, where he was joined by Defendants Cutler and Medendorp, the assistant principal and the school security officer, and his parents were not called. He had already been questioned that day, and a search of his pockets, gym bag, and dime roll conducted, confirming his denial of possession of marijuana at school.

Joseph's only response to whether he would permit a further search, to either Defendant Cutler or Defendant Medendorp, was that he had nothing to hide. In fact, while Joseph and Defendant Cutler were alone before Defendant Medendorp joined them, the subject of a search, much less any kind of strip search, never came up, but Defendant Cutler reported to Defendant Medendorp when he joined them that Joseph agreed to "drop his drawers." Defendant Medendorp told Joseph that he could refuse to allow the strip search and that the three would leave the office, but he did not inform Joseph what the next step would be: whether Joseph's parents would be called and informed about the accusation, whether Joseph would be allowed to go back to class and that would be the end of the inquiry, etc.[12]

Most troubling, the scope of the proposed search, a very intrusive type of strip

---

conflict with *Schneckloth,* which instructed that "[i]n examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041. *Schneckloth* clearly contemplates *consideration* of objectively improper official action, but does not *require* such improper official action, since other circumstances can show a lack of voluntariness. *Cf. id.*

12. It seems very unlikely to the Court that Joseph's outright refusal to consent to a second search would have been the end of the inquiry. Wayland Schools' policy instructs school officials to attempt to receive consent to be searched from the student, including informing the student of his or her right to refuse consent, but instructs that "[t]he principal shall conduct the search, however, with or without the consent." (*See* Plaintiffs' Motion for Summary Disposition, Wayland Schools Policy, at WS 00003.)

search of the person, was not explained to Joseph. He was not told that he would have to pull down his pants, even if he may have assumed that this would be the case. Moreover, he was not told his boxer shorts would be pulled away from his body, and his bare buttocks would be examined.

Joseph Fewless was a vulnerable youth in a situation akin to police custody. Defendants knew of his vulnerability, youth, and behavioral conditions impacting his impulse control and decision-making capacity. He was not provided an opportunity to speak to someone who was an advocate for him like a parent, counselor or attorney. He never gave explicit, clear consent to be searched which is required for a constitutionally valid consent; at most, his statements and actions could be described as acquiescence. *See Williams*, 754 F.2d at 674–75. "I have nothing to hide," without more, is not an expression of consent to be searched, particularly consent to be examined partially naked, as Joseph was. Another individual in Joseph's situation and with his personal traits would not have considered himself or herself to have other options besides "consenting" because he clearly would not be believed or left alone until he "consented" to the strip search.[13] Particularly since Defendants bear the burden of demonstrating the voluntariness of the consent, constitutionally valid consent was not present, even assuming all of Defendants' allegations are true. The "consent" was merely acquiescence and was not freely or voluntarily given.

## B. Whether The Strip Search Was Reasonable Under The Fourth Amendment

■ Nevertheless, the search performed by Defendants Cutler and Meden-

dorp was still within the confines of the Fourth Amendment if it was justified by "reasonable suspicion" that a law or rule of the school was being broken by Joseph Fewless. The Fourth Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by public school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), *cited in Tarter*, 742 F.2d at 981.

The Sixth Circuit has stated that "it is the affirmative obligation of the school authorities to investigate any charge that a student is using or possessing narcotics and to take appropriate steps if the charge is substantiated." *Tarter*, 742 F.2d at 982. The accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. *T.L.O.*, 469 U.S. at 341, 105 S.Ct. 733. Accordingly, the Supreme Court created a two-pronged test defining the boundaries of a lawful search conducted by school officials:

> Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the action was justified at its inception; second, one must determine whether the search actually conducted was reasonably relat-

---

**13.** Even if it is true that Joseph reported to his stepfather Patrick Fewless that he consented to a search, Joseph's own assessment is not legally relevant to whether the circumstances demonstrate the presence of constitutionally valid consent.

ed in scope to the circumstances which justified the interference in the first place. Under ordinary circumstances, a search of a student by a teacher or other school official will be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*T.L.O.* at 341–342, 105 S.Ct. 733 (internal quotations and citations omitted). Thus, this Court looks for a search based on reasonable suspicion and reasonable in scope. *See id.*

A study of the record leads the Court to conclude that the strip search of Joseph Fewless' person was neither justified at its inception by reasonable suspicion nor was it reasonable in scope. First and most compelling, even assuming Defendants' account is true for purposes of Plaintiffs' motion, there was not enough evidence to justify the strip search which occurred. In fact, drawing all reasonable inferences from the available evidence should have led a reasonable official *not* to strip search Joseph without further investigation.

Defendant Cutler received a report in the morning from four students that Joseph Fewless claimed in small engine repair class to have marijuana in his dime roll and acted like he pretended to smoke the dime roll. Three of those four students were to serve a Saturday detention the next day for destroying Joseph's lawnmower in small engine repair class, and some of the students were also ordered to pay restitution. Those four students made their report to Defendant Cutler *en masse* and not independently. (*See* Cutler Dep.

at 5.) Only one student claimed to have seen marijuana, although they all claimed to have seen Joseph's dime roll in addition to hearing him make incriminating statements.

Defendant Cutler then questioned Joseph Fewless, who turned over a pink cigarette lighter to Defendant Cutler, and searched Joseph's pockets, gym bag and dime roll. This search turned up no marijuana.

Two of the students who were to serve a Saturday detention the next day for destroying Joseph's lawnmower, Ryan Terpstra and Justin Lettinga, then made a report, apparently together, to Defendant Cutler that Joseph told them he evaded discovery during the first search because he was hiding marijuana in his "butt crack." The record does not disclose any additional questioning by Defendant Cutler regarding their clearly possible ulterior motives or any questioning designed to elicit information regarding the reliability of their tip. Although Defendant Cutler also received this same report from teacher Curd Alexander, Mr. Alexander's information appears from the record to have come from unidentified students, presumably the informants, rather than firsthand, personal observations. No adult, at any time during this day, smelled marijuana on Joseph or reports having observed him acting suspiciously, erratically, etc.

Defendants claim that because Chet Kemp appeared upset when he reported to Defendant Cutler, saying that he did not want to be around drugs apparently because of a family member's problems with drugs, Chet Kemp's account had additional credibility. This is one inference which can be drawn from such an observation by Defendant Cutler. However, other inferences could reasonably be drawn from an upset student in that situation. For purposes of Plaintiffs' summary judgment mo-

tion, the Court assumes that the inference Defendant Cutler drew was the most reasonable one from his personal observation.

However, Defendant Cutler never conducted any investigation to determine whether other students not associated with the informants and not tainted or less tainted by potential ill will against Joseph might be able to provide any statements or information helpful to determining whether reasonable suspicion existed. He did not speak to other teachers who had contact with Joseph. He never called Joseph's parents to attempt to collect additional information which might be helpful in deciding whether further investigation was warranted. He did not ask further questions of Joseph besides confronting him with the "butt crack" accusation which could have led to discovery of more information. He did not search Joseph's locker or in other locations to look for items which may have led a reasonable person to believe the accusations about Joseph's marijuana possession.

In another case involving a school strip search for drugs, the Sixth Circuit held that qualified immunity shielded the school officials, but the circumstances were very different. *See Williams v. Ellington*, 936 F.2d 881, 882 (6th Cir.1991). There, the Sixth Circuit specifically noted that the principal "was satisfied there was no animosity between [the accused students and the informant] to provide [the informing student] with an ulterior motive for reporting the incident" after questioning the informant if she had any problem with the accused students. *Id.* at 882. On a Tuesday, a student named Ginger reported to the principal after Ginger's mother called the principal that the plaintiff, a female student, and another female student named Michelle had a clear vial containing white powder in class, that the girls were smelling the powder, and that they offered some to Ginger. *Id.* Upon questioning, the

teacher in whose class the incident happened had other, independent observations to back up Ginger's allegations, since the teacher noticed that Michelle was acting strangely, to which Michelle reported to the teacher that she had the flu. *Id.* The teacher also recounted a previous incident involving a note found under the plaintiff's desk, apparently typed by the plaintiff, involving her friends and a reference to a "rich man's drug" which the girls convinced the teacher was a joke. *Id.*

The principal then spent the next few days investigating the allegation, including discussing it with the school guidance counselor, who was also the plaintiff's aunt, and Michelle's father. *Williams*, 936 F.2d at 882. Michelle's father reported that she had recently stolen $200 from his dresser drawer, and he expressed fear that Michelle was using illegal drugs. *Id.* During the same week, Michelle came to the principal and told him that two students, Kim and her boyfriend Steve, were inhaling a drug known as "rush." *Id.* Kim and Steve came to the principal and told him that it was other students, not them, inhaling "rush," so the principal "questioned the motives of these students in coming forward and the validity of the information." *Id.*

On Friday, when the original informant, Ginger, made another report to the principal, the principal and the assistant principal confronted the plaintiff and Michelle. *Williams*, 936 F.2d at 883. Upon confrontation in an administrative office, Michelle produced a vial of "rush" from her purse but claimed that it was Kim's. *Id.* The girls' own lockers were first searched, and then another locker that the plaintiff was known to have been using was searched. *Id.* The plaintiff's books and purse were then searched, and the search produced nothing. *Id.* Then the plaintiff was taken into an office and searched by the female

assistant principal and a female secretary. *Id.* The plaintiff was told to empty her pockets, and she did. *Id.* After being told twice to do so, the plaintiff took off her T-shirt. *Id.* The plaintiff was then required to lower her jeans to her knees. *Id.* The plaintiff claimed, and the assistant principal disputed, that the assistant principal pulled on the elastic of her undergarments "to see if anything would fall out." *Id.* Finally, Williams was told to remove her shoes and socks, and no drugs were found after this search. *Id.*

Despite the fact that Ellington was satisfied that Ginger had no ill motive towards the girls, Ellington attempted to verify the information with other individuals. *Williams,* 936 F.2d at 887. Based upon all the information that Ellington had collected, the Sixth Circuit found that qualified immunity shielded the defendants from suit because it was reasonable to believe that the search comported with the Fourth Amendment. *Id.* at 886–87.[14]

Importantly, the Sixth Circuit also examined to what extent an informant's tip could be used to create reasonable suspicion. *See id.* at 888. In analyzing the tip of an informant, a court is to use a "totality-of-the-circumstances" inquiry and take into account the quantity and quality of the information comprising a tip. *Id.* "While there is concern that students will be motivated by malice and falsely implicate other students in wrongdoing, that type of situation would be analogous to the anonymous tip. Because the tip lacks reliability, school officials would be required to further investigate the matter before a search or seizure would be warranted." *Id.* at 888–89.

The *Williams* Court found that Ellington carefully questioned Ginger, the informing student, to ascertain whether any improper motive existed and satisfied himself that none existed, and thus Ellington assured himself that Ginger's tip was reliable. *Id.* at 889. In addition, Ellington took steps to verify the information. *Id.*

Other cases where school searches have been found constitutional also include the presence of more evidence and evidence of greater reliability than the instant case. The Sixth Circuit found that there was reasonable cause to search a student where school officials personally observed activity they reasonably believed to be the student's use of marijuana and sale of marijuana to another student. *Tarter,* 742 F.2d at 983. In addition, another student identified the plaintiff's picture from a yearbook as a student who sold him marijuana. *Id. See also Cornfield v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1319, 1322 (7th Cir.1993) (strip search found reasonable where school officials observed an unusual bulge in the crotch area of the plaintiff's sweatpants and had collected various allegations that the plaintiff had, on previous occasions, allegedly smoked marijuana on a school bus, hid marijuana in his crotch area, dealt drugs, tested positive for marijuana, and failed to successfully complete a drug rehabilitation program); *Widener v. Frye,* 809 F.Supp. 35, 38 (S.D.Ohio 1992) (holding search reasonable where student who smelled of marijuana and appeared "lethargic" in a manner consistent with marijuana use and gave an unsatisfactory explanation for those factors was told to remove his jeans but not his undergarments).

Conversely, even where school officials had a personal observation by a school employee and some evidence after an initial purse search to indicate improper con-

---

**14.** The Sixth Circuit did not take up the issue of whether the search violated the Fourth Amendment, having decided the qualified im- munity question in the defendants' favor. *Cf. Williams,* 936 F.2d at 886–87.

duct on the part of a student, more evidence than was present in the instant case, another district court still found that a strip search later undertaken was not justified at its inception. *See Cales v. Howell Public Schools,* 635 F.Supp. 454, 455 (E.D.Mich.1985). A female student was observed in the school parking lot during the day by the school security guard, who reported that she attempted to avoid detection by "ducking" behind parked cars. *Id.* Upon being asked who she was, the student gave a name other than her own, and she was taken to the assistant principal's office. *Id.* The student's purse was then searched, which turned up school "re-admittance slips" improperly in her possession. *Id.*

The student was then made to empty her pockets, take off her jeans, and bend over so a female administrator could "visually examine the contents of her brassiere." *Cales,* 635 F.Supp. at 455. The school official in charge stated he believed on the basis of the evidence available the student was in possession of illegal drugs. *Id.* The court held that the search was not reasonable at its inception because while there was reasonable suspicion that the student was violating a school rule or a law, there was not reasonable suspicion that a search would turn up evidence of possession of drugs. *Id.* at 457. As the court pointed out, the student could have been guilty of truancy, stealing hubcaps, or meeting a boyfriend in the middle of the day, but very little if anything from her conduct and the evidence indicated that she was hiding drugs on her person. *Id.*

There are a number of circumstances which would not require an investigation on the scale of what took place in *Williams* before a constitutional search of a student could be performed. "Like police officers, school officials need discretionary authority to function with great efficiency and speed in certain situations, *so long as these*

*decisions are consistent with certain constitutional safeguards.* To question an official's every decision with the benefit of hindsight would undermine the authority necessary to ensure the safety and order of our schools." *Id.* at 886 (emphasis added). On the other hand, the circumstances in this case were simply not enough to create reasonable suspicion justifying a strip search. To put it another way, one does not need the benefit of hindsight in this situation to know this search was unreasonable at its inception.

The informants' credibility was of a highly questionable nature, given their potential ill motives. After the first search of the gym bag and Joseph Fewless' pockets, which also included a search of the item said to contain the marijuana, Joseph Fewless' dime roll, no marijuana was found. There was no other corroborating evidence of marijuana possession, like the smell of marijuana. The only adult to make an accusation was apparently only reporting secondhand information received from the informants themselves. Moreover, the second accusation that Joseph hid marijuana in his "butt crack" to evade discovery is exactly an accusation of the type which might be expected to potentially result in a highly invasive and humiliating search. For this reason, this type of accusation should have been suspect, particularly given the dubious position from which the informants were providing their information.

While much has been made by Defendants about the usually credible nature of the student-informants and the manner in which the reports were made, *i.e.,* that Chet Kemp was apparently upset and therefore appeared more credible, the Court does not see that as enough to remove the taint of the students' obvious motive to falsely accuse Joseph. In addition, while one of the original informants

was not associated with the lawnmower incident, the fact that this student made his report in conjunction with the students who were associated with the lawnmower incident render his word alone not enough to make these reports sufficiently credible to justify the strip search.

The fact that Joseph Fewless has lied to authority figures in the past and demonstrated behavioral problems does not somehow make the student-informants more credible, either. The Court's analysis assumes that Defendants' version is the truth, since the Court is analyzing Plaintiffs' motion for summary judgment. Joseph, despite all of his other discipline problems at school, was never before in any drug-related trouble at school or in any other setting to Defendants' knowledge. Defendants have also brought up incidents occurring *after* the search at issue where Joseph has been accused of possessing or using marijuana, incidents which do not appear to have yet been proven, and nevertheless are still irrelevant. At the time Defendants Cutler and Medendorp undertook the strip search of Joseph, Defendants had far from enough evidence to form reasonable suspicion.

Second, the record evidence also leads this Court to conclude, even considering the evidence in a light most favorable to Defendants, the strip search conducted was not reasonable in scope. Peering into Joseph Fewless' boxer shorts at his bare buttocks may not have been the least intrusive way to detect marijuana, depending on its form and container, hidden between his buttocks. For example, assuming an otherwise constitutionally-

justified search, a student could be asked to shake his or her underwear, while not exposing themselves, to see if any contraband were to come loose and become visible beneath the underwear.

In addition, the search that was performed seems unlikely to have discovered marijuana placed deeply between the buttocks. This fact makes the search performed unreasonable in scope because of its pointlessness: the search could not achieve its aim of conclusively determining whether marijuana was hidden between the buttocks.[15] A strip search which has no hope of achieving its purported aim is not reasonable in scope.

## C. Whether The Defendants Sued Only In Official Capacities Can Be Held Liable

■ Defendants Cutler and Medendorp have been sued in their personal capacities[16] and their official capacities, and the other Defendants have been sued in their official capacities. Personal capacity suits seek to impose personal liability upon a government official for actions he or she takes under color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In contrast, official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. *Id.* at 165, 105 S.Ct. 3099. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Id.* at 166, 105 S.Ct. 3099.

---

**15.** Doing a visual inspection of the perianal area would be the only true way to rule out possession of marijuana between the buttocks, but the invasiveness of that type of search would have rendered it unreasonable in scope as well. Of course, this Court is not saying that making the search more invasive and more of an affront to Joseph's constitu-

tional rights would have been the proper course of action.

**16.** Personal capacity and individual capacity are used interchangeably to describe the same legal concept. *Graham*, 473 U.S. at 165 n. 10, 105 S.Ct. 3099.

To establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *Graham*, 473 U.S. at 166, 105 S.Ct. 3099. More is required in an official-capacity action, however, because a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation. *Id.* at 166, 105 S.Ct. 3099.

In *Monell v. Department of Soc. Servs. of New York*, the Court concluded that a municipality is a "person" within the meaning of § 1983. *Monell*, 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court eliminated *respondeat superior* liability for government bodies when it concluded that a municipality may not be sued under § 1983 for an injury inflicted solely by its employees. *Id.* at 694, 98 S.Ct. 2018. Accordingly, the *Monell* Court required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal policy or custom, whether made by its lawmakers or by those whose acts may fairly be said to represent official policy, that caused the plaintiff's injury. *Id.* at 694, 98 S.Ct. 2018. The municipal policy at issue in this case involves the school's search and seizure policy and guidelines and the custom at issue involves the application of that policy by school officials and the Board of Education.

Congress did not intend to impose liability on a municipality under § 1983 unless *deliberate* action attributable to the municipality itself is the "moving force" behind the plaintiff's deprivation of federal rights. *Board of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 400, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The *Brown* Court further stated that a § 1983 plaintiff must "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."

*Id.* at 404, 117 S.Ct. 1382. The Court then elaborated the level of proof necessary for recovery under § 1983:

> Proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Id.* at 405, 117 S.Ct. 1382. However, the Court further stated that "where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405, 117 S.Ct. 1382.

In *Pembaur v. Cincinnati*, the Supreme Court recognized that under the appropriate circumstances, municipal liability may be imposed for a single decision by municipal policymakers. *Pembaur*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). However, in *City of Oklahoma City v. Tuttle*, the Supreme Court stated that where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation. *Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

The relevant question, regarding the official liability of Board of Education of Wayland Union Schools, Jack Deming, and Thomas Tarnutzer, is whether these De-

822

fendants' deliberate actions were the moving force behind the violation. The policy in existence regarding student searches mirrors the legal standard for school searches, repeated above. "The Board .. directs that no student be searched without reasonable suspicion or in an unreasonable manner. The extent of the search will be governed by the seriousness of the alleged infraction, the student's age, and the student's disciplinary history." (Plaintiffs' Motion for Summary Disposition, Ex. G, Search and Seizure Policy, WS 0001.) Therefore, the Wayland Schools policy governing student searches is constitutional. Moreover, Plaintiffs have presented no evidence suggesting any deliberate actions behind the violation and are not entitled to summary judgment as to any of Defendants sued only in their official capacities.

**D. Qualified Immunity**

█ Defendants Cutler and Medendorp are still entitled to summary judgment as to claims made against them in their personal capacities if they can show entitlement to qualified immunity. Qualified immunity is intended to provide municipal officials sued in their personal capacities with the ability to reasonably anticipate when their conduct may give rise to liability for damages. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

When government officials abuse their offices, action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a[sic]

qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

*Id.* (internal citations and quotations omitted). An official protected by qualified immunity may be held personally liable for an allegedly unlawful official action if the action assessed in light of the legal rules that were clearly established at the time of the action does not meet an "objective legal reasonableness" standard. *Id.* at 639, 107 S.Ct. 3034.

The right must be sufficiently clear that a reasonable official in the defendant's position would understand that what he or she is doing violates the right at issue under the circumstances. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. The very action in question need not have been previously held unlawful, but in light of pre-existing law, the unlawfulness of the action must be apparent. *Id.* "[T]he determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials." *Id.* at 3040. *See also Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (stating that "clearly established," for purposes of qualified immunity, means that the contours of the right must be sufficiently clear that a reasonable official would understand that the action in question violates that right).

In light of pre-existing law, the Court does not find that qualified immunity precludes the personal liability of Defendants Cutler and Medendorp. Having examined the information possessed by them, the Court concludes it was not objectively legally reasonable to believe that Joseph Fewless gave valid consent to be strip

searched,[17] nor that the search was justified by reasonable suspicion or was reasonable in scope.

As to Joseph Fewless' "consent," even ignoring for the moment Joseph's personal characteristics, he only ever said that he had "nothing to hide." This does not indicate clear and unequivocal consent to be searched. Moreover, it is well-settled law that the scope of the consent defines the scope of a search based on consent. Without informing Joseph in some manner about what they were planning to do, no reasonable official could believe that they had Joseph's express permission to conduct the search that Defendants Cutler and Medendorp allege took place. Finally, Defendants Cutler and Medendorp were well aware of Joseph's personal characteristics, and the law is clear that those characteristics, considered in total, can lead to a conclusion of inability to render voluntary consent to a search.

As to the reasonableness of the strip search, a Sixth Circuit case on point, *Williams v. Ellington,* held the school officials protected by qualified immunity only after an investigation much more extensive and reliable than the one that was conducted here. *Williams,* 936 F.2d at 886–87. Moreover, that case specifically discussed how information from student-informants, if reason existed to believe it was unreliable, would require further investigation before reasonable suspicion would exist which justified a search. *Id.* at 888–89. Thus, the decision to strip search Joseph Fewless was not objectively legally reasonable. Moreover, the decision was highly questionable in light of common sense and general experience. Qualified immunity does not bar the personal liability of Defendants Cutler and Medendorp.

## IV. Analysis of Defendants' Motion for Summary Judgment

Having found that Plaintiffs' Motion for Summary Disposition should be granted as to the claim against Defendants Cutler and Medendorp in their personal capacities, Defendants' Motion for Summary Judgment as to those Defendants will be denied. As noted above, Plaintiffs have presented no evidence suggesting any deliberate actions behind the violation and are not entitled to summary judgment as

---

17. The Court could not find any cases involving school officials attempting to obtain legally valid consent from youths with disabilities like ADHD. The cases involving school searches of students either did not address the issue of consent at all or involved situations where consent was clearly not present. *See, e.g., Cornfield,* 991 F.2d at 1319 (school called student's mother to attempt to obtain consent to search, and mother refused). Other cases deciding the voluntariness of consent to search were factually inapposite to the instant case. However, *Schneckloth* clearly instructs courts to examine the totality of the circumstances, specifically naming factors like youth, intelligence, education, and the potentially vulnerable state of the person who consents. *Schneckloth,* 412 U.S. at 226, 229, 93 S.Ct. 2041. "In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer,* —— U.S. ——, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotations and additions omitted). The question is whether the officials had "fair warning" as to the law governing their conduct. *See Hope,* —— U.S. ——, 122 S.Ct. 2508, 153 L.Ed.2d 666. This Court finds that *Schneckloth* gave "fair warning" that Joseph's personal characteristics, as they affected the totality of the circumstances, rendered him unable to voluntarily consent to be searched.

to any of Defendants in their official capacities. Therefore, Defendants' Motion for Summary Judgment will be granted as to all of the Defendants in their official capacities.

## V. Conclusion

The Court will grant summary judgment for Plaintiffs as to the claim made against Defendants Cutler and Medendorp in their personal capacities and will grant summary judgment for Defendants as to the claim made against them in their official capacities. A Judgment consistent with this Opinion will be entered. The issue of Plaintiffs' damages is the sole issue remaining for trial.

### *PARTIAL JUDGMENT*

In accordance with an Opinion filed this day,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (Dkt. No. 74) is **GRANTED in part and DENIED in part.** Plaintiffs' Motion is **GRANTED** as to Defendants Thomas Cutler and Larry Medendorp, as sued in their personal capacities, and **DENIED** as to all Defendants sued in their official capacities.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 75) is **GRANTED in part and DENIED in part.** Defendants' Motion is **GRANTED** as to all Defendants sued in their official capacities and **DENIED** as to Defendants Thomas Cutler and Larry Medendorp, as sued in their personal capacities.